Filed 5/13/14  In re Scarlett R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re SCARLETT R., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065122 |
| Plaintiff and Respondent, | (Super. Ct. No. 516518C-D) |
| v. | |
| TARA G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Christina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Daniella Davidian, Deputy County Counsel, for Plaintiff and Respondent.

Tara G. appeals the juvenile court's denial of her petition under Welfare and Institutions Code section 388,[1] which sought (1) to modify the juvenile court's earlier order denying her reunification services, (2) the return of her children to her custody, and (3) a six-month continuance of the section 366.26 hearing. Tara also appeals the juvenile court's subsequent order terminating her parental rights and selecting adoption as the permanent placement under section 366.26. She challenges the sufficiency of the evidence supporting the juvenile court's finding that the parent-child beneficial relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) does not apply. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

<em>Detention</em>

In February 2013, Tara was pulled over for driving a truck with suspended tags. Tara's four-year-old daughter, Scarlett R., was also in the truck. Because Tara was on informal probation due to prior criminal charges,[2] police searched her vehicle under a Fourth Amendment waiver. Police found two methamphetamine pipes and "a significant amount of methamphetamines" within Scarlett's reach. They also found marijuana in Tara's purse and inside her bra, as well as prescription medication that had been prescribed to someone else. Police arrested Tara and released Scarlett to her paternal grandparents.

Two days later, Tara gave birth to a baby boy, Vincent G. Tara later admitted she had smoked methamphetamine throughout her pregnancy with Vincent, including while she was in

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     Tara was charged in March 2012 with disturbing the peace and possession of a methamphetamine pipe.

2

labor on the way to the hospital. Tara tested positive for methamphetamine and tetrahydrocannabinol at the time of Vincent's birth; Vincent tested presumptively positive.[3] Vincent was transferred to Children's Hospital to assess an apparent skull deformity.

On February 6, 2013, Michael R., Scarlett and Vincent's father, was arrested on a variety of serious charges that included possession of narcotics and intent to sell narcotics.

The San Diego County Health and Human Services Agency (Agency) received separate referrals arising from Tara's arrest in February and the circumstances of Vincent's delivery in February. On February 13, 2013, the Agency filed petitions on behalf of Scarlett and Vincent under section 300, subdivision (b). The petitions alleged the children had suffered, or were at substantial risk of suffering, serious physical harm or illness due to the inability of the parents to supervise or protect the children adequately and provide them with regular care due to the parents' substance abuse.

The Agency's detention report and subsequent addenda provided additional information. In 2007, Tara lost custody of two older children, J.G. and Taylor G., due to her substance abuse. Tara had tested positive for methamphetamine and admitted to consuming methamphetamine the day before she gave birth to Taylor. Tara had been given the opportunity to participate in reunification services that included substance abuse treatment, but she failed to reunify with either child. Tara's parental rights were terminated and both children were adopted by Tara's relatives.

Agency social worker Stephanie Trecha interviewed Michael in jail. Michael acknowledged he had an extensive criminal history and a 20-year history of substance abuse. He described himself and Tara as addicts and reported using methamphetamine, marijuana, and

---

3    Subsequent confirmatory tests showed Vincent tested positive for methamphetamine and amphetamine.

alcohol with Tara throughout their approximately six-year-long relationship—including while Tara was pregnant. Michael said he had full custody of Scarlett, but she has lived primarily with his parents since her birth. Michael described a six-month period when Scarlett lived with him and Tara. Scarlett was an infant and Michael had just been released from prison, was sober, and was working full time. But when Michael relapsed, ending his longest period of sobriety since he was 17, he placed Scarlett back with his parents for her safety. Michael said Tara's pregnancy with Vincent was unplanned and that Tara used methamphetamines, alcohol, and marijuana throughout the pregnancy. He reported being homeless when not incarcerated. Michael stated several times that he and Tara are "[u]nfit to be parents" and that he wanted his parents to adopt the children.

Trecha also interviewed Michael's parents, Richard and Nancy R. (collectively, the grandparents). The grandparents both reported they had concerns about Tara and Michael's ongoing drug dependence, domestic violence, homelessness, and criminal activities. The grandparents stated they had been Scarlett's primary caretakers since she was born, but added that Tara occasionally took Scarlett from them without their permission. Indeed, the week before Tara's February arrest, she had taken Scarlett from the grandparents without their consent. Tara and Michael occasionally stayed with the grandparents. On those occasions, police responded several times due to domestic violence incidents involving Tara and Michael.

The Agency had difficulty locating Tara, but eventually located and interviewed her. Tara admitted she had used drugs throughout her pregnancy with Vincent, including on the way to the hospital while in labor. She said her pregnancy with Vincent was unplanned and that she had already made plans to have a close friend, Antonia P., adopt him. (Antonia reported to social

4

worker Trecha that Tara wanted her to adopt Vincent because "it is just too hard.") Tara acknowledged Michael had full custody of Scarlett, but noted Scarlett was living with the grandparents. Regarding placement, Tara stated "she is ok with Scarlett staying with her grandparents because she is attached to them and it is what she knows, it is her home." Tara was opposed to placing Vincent with the grandparents, however, because she did not believe they would let her see him.

Tara said she attained sobriety when she found out she was pregnant with Scarlett, sometime in 2008. Antonia helped her enter the Family Recovery Center (FRC). But Tara relapsed in 2011, when she used methamphetamine again with Michael. Tara reported Michael was a heavy drug user, and suspected he also sold drugs. The social worker reported Tara appeared to blame Michael for her own drug use.

Tara reported a long history of domestic violence by Michael. On one occasion, Michael punched Tara several times in the face and kicked her in the ribs, which loosened Tara's teeth and cracked her jaw, requiring her to go to the hospital twice. On another occasion, after Tara took Scarlett from the grandparents' home, Michael scratched Tara's arm while grabbing Scarlett away from her. Tara then obtained a restraining order against Michael, but later dropped it.

Tara stated she feels Scarlett is emotionally traumatized and "damaged" from witnessing Michael's domestic violence against Tara. Tara reported Scarlett has asked her, "Did daddy hit you again," and said things like "Mommy, let's just get on the bus and go away from here." Tara stated she has tried to get away from Michael, but he stalks her and sabotages her living arrangements by beating up her landlords, roommates, or relatives. Yet, when the social worker

5

asked about her recent arrest involving Scarlett, Tara stated she was following Michael to their campsite when she was pulled over.

Tara stated she and Michael had been dating for approximately five years, but broke up when Vincent was born. She noted they had broken up several times.

Social worker Trecha opined Tara (1) had a pattern of blaming her drug use and relapses on her partners and others in her life; (2) had been unable to successfully implement the tools and resources provided to her in previous substance abuse programs; and (3) took no responsibility for the methamphetamine pipes found in her possession and within access to Scarlett. Trecha concluded Tara demonstrated little insight into how her drug use impacted her ability to care for and make sound decisions for her children.

At the detention hearing, the juvenile court made a prima facie finding as to both petitions, ordered out-of-home detention for the children, and ordered supervised visits for Tara.

*Jurisdiction/Disposition*

On March 8, 2013, social worker Kali Chosich filed a jurisdiction/disposition report. This report documented Tara's criminal history, which included drug-related charges, and Michael's lengthy criminal history, which included felony charges, domestic violence charges, and drug-related charges. Chosich also reported Tara failed to appear for an on-demand drug test, which was deemed a positive result. Additionally, Chosich documented the numerous occasions on which Tara failed to attend scheduled meetings with her.

Chosich eventually connected with Tara and submitted an addendum report on March 27, 2013. Tara elaborated on Michael's history of domestic violence. She reported he had given her countless black eyes, a cracked rib, facial injuries, a cracked tooth, scars on her head from him

6

hitting her with a beer bottle, and another scar on her face from him head-butting her. Tara said Scarlett had seen four or five of these incidents. Despite this history of violence, Tara explained she was not used to having to provide for herself since Michael had been financially supporting her for the last four years. Tara said that when she moved in with Michael after completing the FRC program she "became very codependent on him."

Tara provided a detailed history of her substance abuse. She began using marijuana and drinking alcohol when she was 13, and started using methamphetamine at 14. At age 17 she became pregnant with J.G. and continued to use methamphetamine during her pregnancy. She subsequently got clean, found a job, and lived on her own with J.G. At age 21, when she became pregnant with Taylor, Tara relapsed and began using methamphetamine again. When Taylor was born with a positive test result for methamphetamine, child welfare services removed J.G. and Taylor from her care. Tara was incarcerated for the majority of the failed reunification period, but was doing so well upon her release from jail that she was granted unsupervised visits with the children and her social worker at the time wanted Tara to start overnight visitation. Tara told Chosich "that she was not ready to be given so much freedom, and as a result, ended up relapsing less than one month later and going back to jail."

Tara stated that after she was released from jail a second time, she met Michael and became pregnant with Scarlett. Tara said she was "on the run" from her criminal charges, so she decided to turn herself in. Tara was able to complete the FRC program instead of going back to jail. She gave birth to Scarlett while Michael was incarcerated. When Michael was released from custody, he, Tara, and Scarlett moved into an apartment together. Shortly thereafter, Michael

relapsed and Tara briefly separated from him. Tara later lost her housing and Michael sought and won custody of Scarlett. Tara relapsed and began using methamphetamine again.

Chosich reported Tara had two-hour weekly supervised visits with Scarlett and Vincent. At the end of two of the visits in March 2013, both Tara and Scarlett cried, hugged, and kissed each other goodbye. Chosich also reported Tara had five intake appointments scheduled at four drug treatment programs, but failed to attend any of them. Tara also failed to drug test on February 25, 2013, and had not made herself available for any other drug testing. She also had been out of contact with the Agency.

On April 4, 2013, the juvenile court found jurisdiction under section 300, subdivision (b), removed the children from the parents' custody, and declared the children dependents of the court. Michael voluntarily waived his right to reunification services, and the court denied reunification services for Tara under section 361.5. The court set a section 366.26 hearing to determine the children's permanent placement.

*The Agency's Section 366.26 Report*

Social worker Jaimi Martin was assigned to the children's case in May 2013. She filed a section 366.26 report on July 11, 2013, in which she recommended the juvenile court terminate the parents' parental rights and order adoption as the children's permanent plan.

As of the date of Martin's report, the children were still living with the grandparents; Tara was incarcerated at Las Colinas Detention Facility (Las Colinas), having been arrested on April

8

26, 2013, on four felony charges, including possession of a controlled substance, vehicle theft, and burglary;[4] and Michael was incarcerated on numerous drug and other offenses.

Martin opined Tara did not have a parent-child bond with the children. Martin wrote that Tara had only visited the children six times since they were placed in protective care, with three of the visits occurring while she was incarcerated. During those visits, Scarlett, who was normally a talkative, smiling child, would become withdrawn and uncomfortable. Scarlett maintained limited eye contact with Tara and would not engage with her freely. By contrast, when Scarlett was with her grandparents, she appeared to be relaxed, would smile, maintain eye contact, and freely share her experiences. Martin observed that while Scarlett gets more comfortable with Tara toward the end of her visits, Scarlett appears to treat Tara as a friendly visitor.

Regarding Vincent, Martin noted that during two visits with Tara, he cried inconsolably, requiring him to be removed from the visitation room and returned to his grandparents. Once he was with his grandparents, he was soothed and stopped crying. Martin opined Vincent knew his grandparents as "mom and dad," recognized them as his primary caregivers, and demonstrated a secure bond with them.

Martin wrote that Scarlett had been in the grandparents' care for the majority of her life, and Vincent had been in their care since his birth. She opined the children were bonded to the grandparents. Martin wrote the grandparents wanted to adopt the children and provide them with a stable, secure, and loving home. The children were doing extremely well in their care and were

---

[4]     Martin noted Tara had enrolled in classes at Las Colinas to address her addiction, but she was dropped from the classes for lack of attendance.

9

securely attached to their grandparents. The grandparents had demonstrated they were capable for caring for the children's day-to-day needs.

Additionally, there were 87 families in San Diego County approved to adopt a child with Scarlett's characteristics; 93 families approved to adopt a child with Vincent's characteristics (including his cosmetic issue); and 39 families approved to adopt a sibling group matching the children's characteristics.

Martin concluded Tara had not demonstrated the presence of any parental bond that would outweigh the benefits of the children being adopted.

On September 10, 2013, the Agency filed an addendum report seeking a 60-day continuance of the section 366.26 hearing so that the Agency could investigate allegations that the grandparents were engaging in physical altercations in front of the children. The juvenile court continued the hearing. After conducting its investigation, the Agency concluded the allegations were unfounded.

*Tara's Section 388 Petition*

On September 10, 2013, Tara filed a section 388 petition seeking to modify the court's previous orders denying her reunification services. She also requested that the court return the children to her care and continue the section 366.26 hearing for six months. The petition argued Tara's circumstances had changed since the court denied her reunification services on April 4, 2013. Tara showed she had completed an 18-hour parenting class, an 18-hour anger management class, and a 10-hour workshop in nonviolent conflict resolution. Tara cited the following additional changed circumstances:

> "[Tara] is currently enrolled in the North County Serenity House
> substance abuse treatment center. She is making good progress and has had

10

all negative drug tests since entering the program. One of the reasons this case came before the court was substance abuse, and now [Tara] has actively sought out a program and is making strides towards completing that program and becoming an appropriate parent."

Although her petition did not cite it as a changed circumstance, Tara was released from Las Colinas on August 7, 2013. From there, she entered the Serenity House substance abuse treatment center, whereupon she tested negative for all substances.

Tara argued modification of the court's orders was in her children's best interests because Tara

"is their mother. The children are placed with relatives, and as such, their permanency would not be impacted by the provision of services to [her]. The children have been placed with the relatives since the inception of the case and the relatives are willing to provide a permanent plan should the mother be unsuccessful in her efforts. Scarlett is four years old and knows her mother, speaks to her, and expresses love for her mother, it would be in Scarlett's, and by virtue of their sibling relationship, Vincent's, best interest to be given a chance to reunify with their one parent who wants to do so."

The juvenile court found Tara made a prima facie showing and set her petition for an evidentiary hearing to coincide with the section 366.26 hearing.

*Section 366.26 Addendum Reports*

Social worker Martin filed an addendum to her section 366.26 report on November 4, 2013. She reported that due to Tara's incarceration and lifestyle, Tara had visited the children only about 16 times. Martin acknowledged the children were becoming more comfortable with Tara, though Tara was not able to care for both children simultaneously. Vincent no longer cried throughout the visits, Tara could lay him down to sleep, and she had changed his diapers four times when prompted to do so. Scarlett looked forward to visits and was excited when Tara brought promised gifts for her. Scarlett played games and colored with Tara, and often instructed

11

Tara on how to properly care for Vincent. However, other than on one occasion in August 2013, the children easily transitioned back to the grandparents after visits were over.

When Martin asked Scarlett to draw a picture of the people Scarlett wanted to live with, she drew a picture that included her parents and grandparents. Scarlett explained she wanted to live with her grandparents and her "other mother," referring to both her grandmother and Tara as "mom" or "mama." Martin continued to characterize the children's relationship with Tara as "more of a friendly family member [than] that of a mother-child relationship." Martin concluded the benefits of the children's relationship with Tara did not outweigh the benefits of adoption.

Martin filed a final addendum to her section 366.26 report on December 9, 2013. She reported Tara continued to attend each of her two-hour weekly visits. Tara's relationship with her children had improved; Scarlett would greet her with excitement and had become more open in sharing her experiences, and Vincent no longer cried throughout the visits. Tara spent the majority of the visits interacting with one child at a time.

Tara continued to test negative for drugs, except on one occasion when she tested positive for morphine.[5] Tara's program counselor reported Tara was doing well in the Serenity House treatment program, had obtained a sponsor, and was on the first step in the 12-step drug treatment program. Tara told Martin she was "stressed out" because she had been asked to look for a job. Tara ultimately found a job—her first in over seven years. Tara told Martin that if the children were returned to her custody, she would move to a room at Serenity House that allowed children.

Martin reported Scarlett and Vincent continued to thrive in their grandparents' care. The grandparents continued to ensure all the children's needs were met on a daily basis and provided

---

5    Tara explained she received a morphine injection because she was supposed to have surgery for a cyst, but the doctors decided at the last minute not to do to the surgery.

12

them with a safe home. Scarlett was very outgoing when with her grandparents, and Vincent continued to be very excited to see his grandmother at the end of visits with Tara.

Martin acknowledged in her report that Tara had "come a long way," but noted Tara "still has a long way to go." Martin also noted Scarlett knows and loves Tara, but turns to her grandparents to meet her daily needs and emotional support. Martin opined that while the children enjoyed visiting Tara, removing them from their grandparents' care would be detrimental to them, as the grandparents had raised them. She further opined adoption appeared to be the most appropriate and beneficial permanent plan for the children.

*The Contested Section 388 and Section 366.26 Hearings*

On December 13, 2013, the court held an evidentiary hearing on Tara's contested section 388 petition and on permanent placement selection under section 366.26. The court received in evidence the Agency's reports and addenda, Tara's section 388 petition and attachments, and a letter from Tara's counselor at Serenity House. The court heard live testimony from Tara and social worker Martin.

Regarding the section 388 petition, the court found Tara failed to demonstrate changed circumstances or that it would be in the children's best interests to grant the relief Tara requested. Regarding permanent placement, the court found both children adoptable, found that none of the exceptions to adoption applied, and ordered adoption as the permanent plan. The court terminated Tara and Michael's parental rights, and named the grandparents as the prospective adoptive parents.

Tara filed a timely notice of appeal.

DISCUSSION

I

*SECTION 388 PETITION*

Tara contends the court erred by denying her section 388 modification petition. She argues she adequately showed changed circumstances and the proposed modification was in the best interests of Scarlett and Vincent. We disagree.

A.     Legal Framework

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 611 (*A.A.*).) "The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*Id.* at pp. 611-612.) "Generally, the petitioner must show by a preponderance of the evidence that the child's welfare requires the modification sought." (*Id.* at p. 612.)

"It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) The fact that the parent "makes relatively last-minute (albeit genuine) changes" does not automatically tip the scale in the parent's favor. (*Id.* at p. 530.) Instead, courts should examine at least the following factors: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children

14

to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Id*. at p. 532.) "While the bond to the caretaker cannot be dispositive [citation], . . . our Supreme Court made it very clear in [*In re Jasmon O*. (1994) 8 Cal.4th 398, 408] that the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion." (*Ibid.*)

A petition under section 388 "is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion." (*A.A.*, *supra*, 203 Cal.App.4th at p. 612.) An abuse of discretion occurs when the juvenile court exceeds the bounds of reason by making an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318.)

### B.    Analysis

#### 1.    *Changed Circumstances*

Tara contends she established changed circumstances by showing she had enrolled at Serenity House; had completed courses in parenting, anger management, and nonviolent conflict resolution; had consistently tested negative for drugs since being released from Las Colinas in August 2013; was working a 12-step program; had secured employment; had ended her relationship with Michael; and would move to another room at Serenity House if she regained custody of her children. Nevertheless, the juvenile court found that based on the length of Tara's history of drug abuse and criminal behavior compared to the brevity of her current sobriety, the court "cannot say that there . . . has been a significant enough change for us to reverse the previous order . . . ." We see no abuse of discretion in that finding.

15

Tara had a substantial history of substance abuse. She was 28 at the time of the contested hearing, and had begun using alcohol and marijuana at age 13 and methamphetamine at age 14. She used methamphetamine throughout her pregnancies with her two older children, and continued using despite the termination of her parental rights over them. After a brief period of sobriety during her pregnancy with Scarlett, Tara resumed using methamphetamine during her pregnancy with Vincent, leaving drugs and paraphernalia accessible to Scarlett. Tara continued using drugs during the course of this dependency case.

In contrast to her extensive history of drug abuse, Tara had demonstrated only four months of sobriety in a structured residential setting. She acknowledged that leaving a structured environment can, "of course," create stress. After four months at Serenity House, Tara was only on the second step of her 12-step program; she acknowledged some women take six to 12 months to complete the process. Despite Tara's progress at Serenity House, she admitted she had relapsed twice in the past, including after she had achieved a year of sobriety after graduating from the FRC substance abuse treatment program. (See *In re Jasmon O., supra*, 8 Cal.4th at p. 424 [" '[A] measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.' [Citation.]"].)

Tara also maintained a relationship with Michael for approximately six years, despite his drug abuse and repeated acts of serious domestic violence against Tara—acts Tara acknowledged Scarlett had witnessed and been damaged by. Tara maintained her relationship with Michael throughout the majority of the dependency case, including by writing to him while she was incarcerated from March to August 2013. Tara testified at the contested hearing that she had ended her engagement to Michael a couple months earlier, throwing away her engagement ring.

16

But Tara and Michael had both previously described their relationship as on again, off again, and Tara acknowledged being codependent on Michael. Tara's ability to muster the strength to separate from Michael may also have been aided by his incarceration at the time, which was only a temporary circumstance.

Finally, we need look no further than Tara's own words to confirm the juvenile court did not abuse its discretion in finding no changed circumstances. Tara's own petition stated she "*is making* good progress" and "*is making* strides," both of which suggest Tara's condition was merely *changing*, and not *changed*. (Italics added; see *In re Casey D.* (1999) 70 Cal.App.4th 38, 48-49 (*Casey D.*).) Similarly, Tara testified she was trying to stay at Serenity House as long as she could "to make sure that I have all the tools and I am confident in doing my life the way that I need to do it and successfully do it." She viewed the residential program as a "safety net" that "has been helpful for me so that I can work through the things that *I'm working through right now* in a safe environment." (Italics added.)

Based on all of the above, we conclude the juvenile court did not abuse its discretion in finding Tara failed to establish changed circumstances that justified modifying the court's prior orders.

## 2.    *The Children's Best Interests*

Because Tara failed to establish changed circumstances, we need not address whether modifying the court's prior orders was in the children's best interests. (*A.A.*, *supra*, 203 Cal.App.4th at pp. 611-612.)

17

II

*PERMANENT PLACEMENT UNDER SECTION 366.26*

Tara contends the juvenile court further erred by finding the parent-child beneficial relationship exception to adoption did not apply. We disagree.

A. Legal Framework

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child." (*Casey D., supra,* 70 Cal.App.4th at p. 50.) The court may order one of three alternatives: adoption, legal guardianship, or long-term foster care. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*); § 366.26, subd. (b)(1)-(5).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*Autumn H.*, at p. 573.) Adoption necessarily involves termination of the biological parents' legal rights to the child. (*Id.* at p. 574.) Once the court determines by clear and convincing evidence that a child is likely to be adopted, it becomes the parent's burden to show that termination of his or her rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re C.F.* (2011) 193 Cal.App.4th 549, 553 (*C.F.*).)

The exception at issue here applies when termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Autumn H.*, we interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) "In other words, the

court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Ibid*.)

The showing required to support the beneficial relationship exception is a substantial one. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)  After all, "[i]nteraction between natural parent and child will always confer *some* incidental benefit to the child. . . ."  (*Autumn H., supra,* 27 Cal.App.4th at p. 575, italics added.)  Therefore, "[t]he parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent."  (*C.F.*, *supra*, 193 Cal.App.4th at p. 555; *Autumn H.,* at p. 575.)  That "relationship arises from the day-to-day interaction, companionship and shared experiences."  (*Autumn H.,* at p. 575.)[6]  It is not enough that the parent "demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant."  (*In re Derek W.* (1999) 73 Cal.App.4th

---

6      We clarified in *Casey D.*, *supra*, 70 Cal.App.4th at page 51 that "[d]ay-to-day contact is not necessarily required, although it is typical in a parent-child relationship.  A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction."  "The benefit of continued contact between mother and children must be considered in the context of the . . . visitation mother was permitted to have."  (*In re Brandon C*. (1999) 71 Cal.App.4th 1530, 1537-1538.)  But the beneficial relationship exception is "difficult to make in the situation . . . where the parents have [not] advanced beyond supervised visitation." (*Casey D.,* at p. 51.)

19

823, 827.) "One can know a child's interests, enjoy playtime together, and be a loved relative, but not occupy a parental role in the child's life." (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523.) "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854.)

Whether the beneficial relationship exception applies must be determined on a case-by-case basis. (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.) We review the juvenile court's determination under the substantial evidence standard. (*Id.* at p. 576.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *Autumn H.,* at p. 576.)

### B.      Analysis

The juvenile court found, and the Agency agrees, that Tara satisfied the first requirement of the exception by establishing she maintained regular visits with the children. We therefore address whether substantial evidence supports the juvenile court's determination that Tara failed to carry her burden on the second prong—that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 ["[T]he juvenile court must engage in a balancing test,

20

juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family."].)  We conclude substantial evidence supports that determination.

By the time of the contested hearings, Tara had not progressed beyond supervised weekly visits, which, although improved, still remained tense and revealed Tara's difficulty in tending to both children at once.  In that vein, Scarlett had become "parentified"—"she often coache[d] [Tara] how to take care of Vincent"—which was unhealthy and stressful to Scarlett.  As a result, Scarlett was more reserved during visits with Tara, and more outgoing when she was with her grandparents.  Social worker Martin opined that, on the whole, Tara's role with her children was more akin to a friendly family member than a parent.

By contrast, the grandparents were meeting all the children's needs and the children were thriving in their care.  Vincent had lived his entire life with the grandparents, and Scarlett had lived all but a few months of her life with them.  Even Tara was initially "ok with Scarlett staying with her grandparents because she is attached to them and it is what she knows, it is her home."

On balance, Martin opined that if the court terminated Tara's parental rights, Scarlett would miss Tara, but would not suffer detriment; on the other hand, both children would suffer detriment if they were removed from their grandparents. Substantial evidence supports the juvenile court's determination in this regard. (See *Casey D.*, *supra*, 70 Cal.App.4th at p. 53 ["The trial court was entitled to find the social worker credible and to give greater weight to her assessments and testimony."].)[7]

## DISPOSITION

The orders are affirmed.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.

---

[7] Tara's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), is misplaced. "*S.B.* is confined to its extraordinary facts." (*C.F.*, *supra*, 193 Cal.App.4th at p. 558.) In *S.B.*, the evidence showed that despite the child's strong, positive, significant relationship with her caregiver, she would be "greatly harmed" by the loss of the equally significant, positive relationship she shared with her father. (*S.B.*, at p. 300.) Additionally, the father in that case had complied with every aspect of his case plan and the child wanted to live with him. (*Id*. at pp. 300-301.) Tara made no such showing here.